**IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST**

BUSINESS ENABLED ACQUISITION
AND TECHNOLOGY, INC.,

                Plaintiff,

    v.

UNITED STATES OF AMERICA,

                Defendant.

No. _____

Judge _____

███████████████

**COMPLAINT**

Plaintiff Business Enabled Acquisition and Technology, Inc. dba BEAT ("BEAT"), by and through its undersigned attorneys, hereby submits this Complaint against Defendant the United States of America, acting through the Department of the Air Force, Air Force Civil Engineer Center ("AFCEC" or the "Air Force") and states as follows:

**NATURE OF THE ACTION**

1.      This post-award bid protest challenges two flagrant violations of procurement law:

(1) The Air Force has made award to a contractor team comprised of Inserso Corporation ("Inserso") and Balgro LLC ("Balgro") that possessed a clear "unfair competitive advantage" resulting from Balgro's recent hiring of a former Air Force Program Manager ("PM") who, until September 2025, *oversaw performance* of the incumbent contract held by BEAT and had access to all manner of non-public, competitively-useful information; and

(2) The Air Force has disclosed, only after award, that the award allegedly relies on the agency's Other Transaction Authority ("OTA") under 10 U.S.C. § 4022. Yet this procurement

meets *none* of 10 U.S.C. § 4022's requirements for the application of OTA. Thus, this award is unauthorized by and contrary to law.

2.      This procurement involves Commercial Solutions Opening ("CSO") Solicitation No. FA8903-26-S-C001, Closed Area of Interest ("AoI") No. Closed-26-02, titled "Air Force Civil Engineering Center Business Systems Modernization" (the "Solicitation").

3.      The Solicitation sought solutions to modernize AFCEC's legacy Civil Engineer IT portfolio, including implementing secure, cloud-ready architecture, executing comprehensive data modernization, and integrating AI-enabled analytics to enhance installation readiness, resilience, and data-driven decision-making.

4.      BEAT is the current incumbent contractor for this work under Contract No. 47QTCB21D301/47QFNA24F0051 (the "Incumbent Contract"), which BEAT has performed since July 2024.

5.      *First*, the Air Force's award to the Inserso/Balgro team is tainted by an unfair competitive advantage resulting from Balgro's relationship with █████████████, the former Government PM for BEAT's Incumbent Contract.

6.      █████████ served as the Government PM for the Incumbent Contract from the inception of BEAT's performance until September 2025, when he left the agency and joined Balgro as a "Strategic Advisor."

7.      In his role as the Government PM, █████████ had ongoing, substantive involvement in the AFCEC programs and systems at the heart of this procurement.

8.      In his former role at the agency, █████████ had access to—and was intimately familiar with—non-public, competitively-useful information concerning the agency's programs, systems, and the instant procurement, including contract performance details, pricing and labor

information, staffing levels, technical approaches, and the Government's acquisition planning and budgetary considerations for the follow-on effort.

9.    ████████'s involvement in this procurement on behalf of the Inserso/Balgro team, only a few months after leaving the agency, infects this procurement and gives rise to a classic unfair competitive advantage that reasonably should result in the Inserso/Balgro team's disqualification.

10.    *Second*, the Air Force purports to have made this award based on its authority under 10 U.S.C. § 4022 to carry out "prototype projects."  The Air Force's reliance on the OTA statute in this regard is contrary to law.

11.    As a preliminary matter, the word "prototype" appears nowhere in the AoI document, and nothing about the Solicitation suggested that this procurement—a natural follow-on procurement to BEAT's Incumbent Contract—was being conducted under OTA.

12.    More important, this procurement fundamentally does *not* involve a "prototype project" and meets *none* of the prerequisites for the use of OTA, as set forth in 10 U.S.C. § 4022(d).

13.    Accordingly, BEAT requests that the Court, *inter alia*: (1) declare that the awardee benefitted from an unfair competitive advantage and therefore should be disqualified from the procurement; (2) declare that the Air Force's reliance on OTA in making award is contrary to law; (3) enjoin performance of the awarded contract; (4) order the Air Force to re-assess its procurement strategy in light of these findings; and (5) grant BEAT such other and further relief as the Court may deem just and proper.

## PARTIES

14.    Plaintiff BEAT is a leading small business provider of healthcare and information technology solutions to federal agencies, including the Department of the Air Force.  BEAT is the

incumbent contractor performing the AFCEC FMO IT Support contract that is being replaced by the Solicitation at issue.  BEAT is located at 802 East Quincy Street, San Antonio, Texas 78215.

15.    Defendant is the United States of America, acting by and through the Air Force.

## JURISDICTION

16.    This Court has jurisdiction over this bid protest under the Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870 (1996), which allows the Court to hear "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

17.    Because this protest challenges the agency's violation of statute in its unlawful use of OTA authority in connection with this procurement, the Court has jurisdiction.

18.    Moreover, even if this were a protest of a lawful OTA award, the Court has jurisdiction because this Court is "the de facto forum for bid protests involving 'other transactions' (OTs) and 'other transaction agreements' (OTAs)." *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 284 (2025).  More specifically, this Court's bid protest jurisdiction extends to CSO and OTA procurements where the solicitation "ha[s] a direct effect on the award of a contract" and was not "separate and distinct" from a procurement decision.  *Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777, 787 (2021) (exercising Tucker Act jurisdiction over Air Force CSO that led directly to an IDIQ contract award).

## STANDING

19.    BEAT, as an actual offeror under the Solicitation, is an "interested party" for purposes of this bid protest action.  *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345,

1352 (Fed. Cir. 2004) (an "interested party" is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract"). BEAT's direct economic interests are affected by the agency's unreasonable award decision. BEAT, the incumbent contractor and an actual competitor for this follow-on requirement, had a substantial chance of receiving the Contract but for the procurement errors alleged herein.

**STATEMENT OF FACTS**

A.    **BEAT's Incumbent Contract and ███████'s PM Role**

20.    On March 15, 2024, AFCEC awarded the Incumbent Contract.

21.    The contract subsequently became the subject of a GAO bid protest of a different team led by Inserso. Following resolution of the protest, BEAT's performance began around July 2024.

22.    From that point until September 2025, ███████ served as the PM overseeing BEAT's performance.

23.    In this role, ███████ performed, *inter alia*, each of the following functions: (1) he reviewed and approved the qualifications of BEAT's incumbent employees; (2) he participated in budgetary discussions related to the program; (3) he met regularly with members of BEAT's incumbent team to discuss various aspects of performance; (4) he met weekly with BEAT's Program Manager, ███████, for the same purpose; and (5) he was directly involved in government planning for future requirements in connection with many of the AFCEC systems encompassed by this procurement, including the Environmental Restoration Program Management System ("ERPIMS"), the Integrated Information Tool ("IIT") and the AFCEC Portal.

24.    The following documents reflect examples of ███████'s performance of the foregoing functions: Exhibit A is an example of an email exchange reflecting ███████'s

5

involvement in BEAT staffing decisions; <u>Exhibit B</u> is an email reflecting ████████'s involvement in BEAT's budgetary discussions relating to the Incumbent Contract; <u>Exhibit C</u> is an email titled "Weekly PM Sync" that reflects ████████'s weekly meetings with ██████ to discuss various topics related to BEAT's performance; and <u>Exhibit D</u> is an email titled ████████████████ ████████" that reflects one of the many strategic discussions concerning program requirements in which ████████ was involved.

25.    BEAT's Monthly Status Reports ("MSRs") for the Incumbent Contract also reflect ████████'s close involvement with BEAT's performance and program requirements.

26.    For example, the October 2024 MSR shows that BEAT was working directly with ████████ on "migration/development efforts" for certain applications relevant to performance:



<u>Exhibit E</u> at 7.  Indeed, almost all of BEAT's MSRs from 2024 and 2025 reference ████████'s important role in contract oversight.

27.    In short, while at AFCEC, ▮▮ ▮▮▮ had access to non-public, competitively-useful information, including BEAT's contract performance details, technical approaches, staffing levels, monthly performance reviews of the incumbent contractor, and the Government's own acquisition planning and budgetary considerations for the follow-on effort.

28.    ▮▮. ▮▮▮ also had access to non-public information regarding the systems specifically identified in the Solicitation, including the ERPIMS, IIT and AFCEC Portal. As discussed below, the Solicitation encompasses these systems.

29.    ▮▮▮▮ was employed by AFCEC until September 30, 2025, when he accepted the position of Strategic Advisor to Balgro.

30.    As Balgro advertised on LinkedIn at the time:



**B.     The Solicitation**

31.     The agency issued the CSO and AoI on January 21, 2026, just a few months after ███████'s move to Balgro.     These documents are attached hereto as <u>Exhibits F and G</u>, respectively.

32.     The AoI describes the procurement's scope as follows:

> The Air Force Civil Engineer Center (AFCEC) seeks innovative solutions to modernize its legacy Civil Engineer (CE) Information Technology (IT) portfolio.

This effort requires implementing secure, cloud-ready architecture, executing comprehensive data modernization, and integrating Artificial Intelligence (AI)-enabled analytics to enhance installation readiness, resilience, and data-driven decision-making.

Ex. G at 1.

33.    The AoI identified the following systems within the scope of the effort: Environmental Restoration Program Management System (ERPIMS), Integrated Information Tool (IIT), AFCEC Portal, Administrative-IR, Research Development Modeling & Simulation (RDM&S), Inventory Management, Chemical Database and Operations Work Order SharePoint Tools, as well as any new additions to the CE IT IEO-managed IT portfolio.  *Id.* at 5.

34.    The AoI included the following submission requirement:

**5.0  Submission Requirements**

A Spiral 1 white paper brief must be sent via e-mail submission with subject line stating "Air Force Civil Engineering Center Business Systems Modernization" to the POC listed in paragraph 6.0 by the date and time this AoI closes - 5:00 P.M. (CST) on 10 March 2026.

Spiral 1 3 written solution briefs received after the specified due date and time will be discarded and not be evaluated by the Government.

*Id.*

35.    BEAT timely submitted a proposal in response to the Solicitation.

**C.    ▮▮▮▮▮▮▮ Was Directly Involved in this Procurement After Joining Balgro**

36.    Further emails reflect that ▮▮▮▮▮▮ continued to be involved in activities related to these same AFCEC programs well into 2026, after joining Balgro.

37.    For example, on February 19, 2026, ▮▮▮▮▮▮ attended an ERPIMS meeting and thereafter requested briefing slides from that meeting.  Attached hereto as <u>Exhibit H</u> is the email reflecting ▮▮▮▮▮▮'s attendance at the ERPIMS meeting.  Again, ERPIMS is one of the systems specifically encompassed by the Solicitation.

38.     On March 10, 2026, ████o██ initiated an email requesting that the AFCEC Portal team grant access to a new AFCEC employee.  This email is attached hereto as Exhibit I.

39.     BEAT does not understand why ████████ would be in a position to request such access for a government employee, but the email demonstrates his continued involvement in onboarding and system access decisions for the very programs at issue in this procurement.  As stated, the AFCEC Portal is another system specifically identified in the Solicitation.[1]

**D.     Award**

40.     On July 10, 2026, ███i█ ███, Executive Vice President of Inserso, sent a recruitment email to numerous current BEAT employees who perform the Incumbent Contract.

41.     Attached hereto as Exhibit J is a copy of ████████'s email, which stated:

Inserso partnered with Balgro LLC (owned by Hugo) to bid on the Business Systems Modernization contract to support AFCEC CB and we were awarded the contract today!  This contract will be replacing the existing AFCEC IT support contract.  If you are receiving this email, we want to bring you onto the Inserso/Balgro team to continue to support CB!

Ex. J.

42.     ████████ stated further: "I understand the existing support contract with BEAT will be ending next week.  We are in the process of getting a transition webpage and email set up to move forward very quickly!"  *Id.*

43.     Despite several inquiries from BEAT, as of the date of this filing, the Air Force contracting team still has not officially notified BEAT of the award to the Inserso/Balgro team.

---

[1]  To the extent that ████████ is subject to a one-year "cooling-off" period mandated by 18 U.S.C. § 207(c), it appears that ████████ has been violating that restriction by interfacing with his former colleagues as part of this procurement.

### E.    GAO Protest

44.    On July 15, 2026, BEAT filed a protest with the Government Accountability Office ("GAO"), Matter No. B-424650.1, challenging the Air Force's award of the Contract to the Inserso/Balgro team on the basis that the Inserso/Balgro team benefitted from an unfair competitive advantage.

45.    On July 17, 2026, the Air Force filed a Request for Dismissal of the GAO action, arguing that GAO lacks jurisdiction to hear a protest of this OTA award.

46.    Importantly, while the underlying CSO document stated that orders could be issued "under the Federal Acquisition Regulation (FAR) and/or Other Transaction Authority (OTA), as specified in each ItP [Invitation to Propose]," Ex. F at 8, the AoI document specific to this procurement made no representation whatsoever concerning the agency's use of OTA for this procurement.  *See* Ex. G.

47.    The agency's Request for Dismissal included a copy of the purported award document, which is styled as an "Other Transaction Award" purportedly issued under 10 U.S.C. § 4022.  This document is attached hereto as Exhibit K.

48.    The document identifies Inserso as the prime contractor and specifies a total contract value (base and all options) of $33,437,419.98 and a period of performance from July 13, 2026 through January 12, 2032.  Ex. K at 1.

## COUNT I

### (Declaratory and Injunctive Relief as to the Unlawful Award
### Resulting from Unfair Competitive Advantage)

49.    BEAT incorporates by reference the foregoing paragraphs as if fully stated herein.

50.    Contracting officers have an obligation to avoid even the appearance of impropriety

in government procurements.  *See* FAR 3.101-1; *see also Celeris Sys., Inc.*, B-404651, Mar. 24, 2011, 2011 CPD ¶ 72 at 7.

51.    In this regard, where a firm may have gained an unfair competitive advantage through its hiring of a former government official, the firm can be disqualified from a competition based upon the appearance of impropriety resulting from this situation, even if no actual impropriety can be shown. *NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 376-77 (Fed. Cir. 1986) (holding that "the appearance of impropriety was certainly enough for the CO to make a rational decision to disqualify"); *Raytheon Co. v. United States*, 170 Fed. Cl. 561, 565 (2024) (the government may eliminate an offeror "based on the mere appearance of impropriety" and "is not required to find that an alleged impropriety had an actual (or even likely) impact on the procurement").

52.    In determining whether an offeror obtained an unfair competitive advantage in hiring a former government official, the Court applies a four-factor framework, considering: (i) whether the offeror had access to non-public information unavailable to the protester; (ii) whether that information was competitively useful; (iii) whether the unequal access afforded an unfair advantage; and (iv) whether the lack of equal access prejudiced the protester.  *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196 (2007); *see A Squared Joint Venture v. United States,* 136 Fed. Cl. 321, 330 n.6 (2018) ("it is generally recognized that '[t]he unfair competitive advantage analysis stemming from a firm's use of a former government employee is virtually indistinguishable from the concerns and considerations that arise in protests where there is an allegation that a firm has gained an unfair competitive advantage arising from its unequal access to information as a result of an organizational conflict of interest.'" (quoting *Health Net Fed. Servs., LLC*, B-401652.3, *et al.*, Nov. 4, 2009, 2009 CPD ¶ 220 at 28 n.15)); *see also Int'l Res. Grp.*, B-409346.2, *et al.*, Dec. 11, 2014, 2014 CPD ¶ 369 at 9 (sustaining protest where contracting officer failed reasonably to consider whether awardee's

employment of former agency official gave the awardee access to competitively-useful, non-public information resulting in an unfair competitive advantage); *see also Serco Inc.*, B-419617.2, *et al.*, Dec. 6, 2021, 2021 CPD ¶ 382 (sustaining protest where former agency officials participated in awardee's proposal preparation efforts only months after having access to a variety of competitively-useful, non-public information in connection with their government service).

53.    Once a conflict is established by hard facts, prejudice is presumed.  *ARINC Eng'g*, 77 Fed. Cl. at 203 ("[T]he protester need not show that the information possessed by its competitor specifically benefitted the latter's proposal—that prejudice is presumed . . . ."); *NetStar-1 Gov't Consulting, Inc. v. United States,* 101 Fed. Cl. 511, 529 (2011) ("when a potential significant OCI is identified, prejudice stemming from that OCI is presumed, unless the evidence shows compelling evidence to the contrary"); *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 576 (2010) ("when an OCI is found, prejudice stemming from that OCI is presumed").  The hard facts required are those establishing the *existence* of the unfair competitive advantage, not its specific impact.

54.    Based on the facts detailed above, BEAT has established a *prima facie* case of an unfair competitive advantage resulting from ███████'s involvement with the Inserso/Balgro team.

55.    To recap, in his role with the agency, ████████:

(1) Reviewed and approved the qualifications of BEAT's incumbent employees.  *See* Ex. A (discussing BEAT's staffing list and employee qualifications).

(2) Participated in budgetary discussions related to BEAT's Incumbent Contract.  *See* Ex. B ("████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████.").

(3) Met regularly with members of BEAT's incumbent team, including ████████, to discuss various aspects of performance. *See* Ex. C ("Weekly PM Sync" to discuss program details) & Ex. E.

(4) Was directly involved in government planning for future requirements in connection with many of the AFCEC systems encompassed by this procurement, including the ERPIMS, IIT and AFCEC Portal. *See* Exs. D & E.

56.    Moreover, ████████ *continued* to be involved in this program while working for Balgro. *See* Exs. H & I.

57.    BEAT's proposal submission is attached hereto as <u>Exhibit L</u>. ████████ had significant and unfair insight into the BEAT confidential and proprietary information discussed therein, including BEAT budgeting efforts and BEAT's strategies with respect to each Solicitation Objective.

58.    The following screenshots reflect just several of many examples of the confidential and proprietary information at issue:

████████████████████████████████████████████████████████



Ex. L at 7 & 9.



*Id.* at 14.



*Id.* at 24.



*Id.* at 28.



*Id.* at 44.

59.     Collectively, the foregoing facts establish BEAT's *prima facie* case and show that the Inserso/Balgro team should be disqualified from the procurement.

60.     The award instead should be made to BEAT, which had a substantial chance of award but for the improper award to the Inserso/Balgro team.  BEAT therefore is prejudiced by the awardee's unfair competitive advantage in this procurement.

## COUNT II

**(Declaratory and Injunctive Relief as to the Agency's Unlawful Exercise of OTA Authority)**

61.     BEAT incorporates by reference the foregoing paragraphs as if fully stated herein.

62.     The Air Force purports to have awarded Inserso Agreement No. FA8903269B008 as an "Other Transaction—Prototype" under the authority of 10 U.S.C. § 4022.  *See* Ex. K.

63.     The agency's exercise of OTA authority is contrary to law because the Air Force failed to satisfy the mandatory threshold conditions of 10 U.S.C. § 4022(d) before entering into this transaction. Section 4022(d) provides, in full:

(d) Appropriate Use of Authority.-

> (1) The Secretary of Defense shall ensure that no official of an agency enters into a transaction (other than a contract, grant, or cooperative agreement) for a prototype project under the authority of this section unless one of the following conditions is met:

> (A) There is at least one nontraditional defense contractor or nonprofit research institution participating to a significant extent in the prototype project.

> (B) All significant participants in the transaction other than the Federal Government are small businesses (including small businesses participating in a program described under section 9 of the Small Business Act (15 U.S.C. 638)) or nontraditional defense contractors.

> (C) At least one third of the total cost of the prototype project is to be paid out of funds provided by sources other than the Federal Government.

> (D) The senior procurement executive for the agency determines in writing that exceptional circumstances justify the use of a transaction that provides for innovative business arrangements or structures that would not be feasible or appropriate under a contract, or would provide an opportunity to expand the defense supply base in a manner that would not be practical or feasible under a contract.

10 U.S.C. § 4022(d)(1).

64.     The Air Force has not satisfied—and cannot satisfy—any of these four conditions. First, with respect to condition (A), 10 U.S.C. § 3014 defines "nontraditional defense contractor" as "an entity that is not currently performing and has not performed, for at least the one-year period preceding the solicitation … any contract or subcontract for the Department of Defense that is subject to full coverage under the cost accounting standards[.]"  Here, all of the offerors in this procurement were traditional, for-profit, defense contractors with well-established records of performing government contracts and subcontracts.

65.     Second, with respect to condition (B), this competition was conducted on a full and open basis for both large and small businesses.  *See id.* ("This CSO is a full and open acquisition."); *see also* Ex. G at 3 (showing that, although the AoI originally may have been intended as a small business set-aside, the Air Force removed that requirement, as indicated by the strikethrough of "small business" in the phrase "[i]nterested ~~small business~~ vendors").

66.     Third, with respect to condition (C), the OTA Award document reflects that the work is funded entirely by the Federal Government.  There is no indication of any non-federal funds being contributed to this procurement, let alone the one third threshold the statute requires.

67.     Fourth, with respect to condition (D), there are no exceptional circumstances that "would not be feasible or appropriate under a contract," and there is no indication that a senior procurement executive made any such determination in writing.  The work

at issue is the follow-on contract for software engineering and IT support services for AFCEC, which BEAT currently performs under the Incumbent Contract, which itself was competed as a standard FAR-based requirement. There is nothing about this requirement that suggests a need for innovative business arrangements that could not be accommodated under a typical government contract.

68.     In addition to failing to meet any of the four conditions above, the transaction fails the more fundamental prerequisite that the work be a "prototype project" within the meaning of 10 U.S.C. § 4022(e)(5). The statute defines prototype project to include the following:

(A) a proof of concept, model, or process, including a business process;
(B) reverse engineering to address obsolescence;
(C) a pilot or novel application of commercial technologies for defense purposes;
(D) agile development activity;
(E) the creation, design, development, or demonstration of operational utility; or
(F) any combination of subparagraphs (A) through (E).

10 U.S.C. § 4022(e)(5).

69.     None of these categories describes the work here. The AFCEC Business Systems Modernization effort is the direct continuation of the services BEAT has performed under the Incumbent Contract since July 2024.

70.     This conclusion is reinforced by the CSO itself, which provided that deliverables "may include data items, software, hardware, prototypes, etc.," and that "[e]ach ItP will identify each applicable Deliverable and expectations for delivery, timing, recipients, etc." Ex. F at 8. The AoI for this procurement designated no prototype deliverables and does not use the word "prototype" anywhere in its description of scope, systems, or required capabilities.

71.     A comparison between the Incumbent Contract's Performance Work Statement ("PWS") and the AoI confirms that the overwhelming majority of the work awarded under the

alleged OTA is not new and not a prototype.  The PWS is attached hereto as Exhibit M.

72.     The PWS addresses BEAT's performance in connection with five AFCEC systems: IIT, AFCEC Administrative Record, AFCEC Portal, ERPIMS, and Research Development Modeling and Simulation (RDM&S).  *See* Ex. M at 5.

73.     The AoI places those same five systems at the center of the new effort: "AOI will involve the following systems: ***Environmental Restoration Program Management System (ERPIMS), Integrated Information Tool (IIT), AFCEC Portal, Administrative-IR, Research Development Modeling & Simulation (RDM&S)***, Inventory Management, Chemical Database and Operations Work Order SharePoint Tools as well as any new additions to the CE IT IEO-managed IT portfolio."  Ex. G at 5 (emphasis added).

74.     In addition, four of the six technical/capability requirements listed in the AoI closely track the existing PWS tasks, including the specific tools, personnel roles, and certifications.

75.     First, the AoI's Cybersecurity and Risk Management Framework capability requires the contractor to "provide comprehensive cybersecurity support, acting as the Information Systems Security Manager (ISSM)," to "[d]evelop, manage, and update A&A packages in eMASS, including the System Security Plan (SSP), Security Test Plans (STP), and Plan of Action & Milestones (POA&M)," and to "[p]erform continuous monitoring using tools like Assured Compliance Assessment Solution (ACAS), conduct vulnerability analysis, and remediate findings from Security Technical Implementation Guides (STIG) and Security Content Automation Protocol (SCAP) scans to ensure system compliance."  Ex. G at 3.

76.     Similarly, Task 4 of the PWS, "Provide Cybersecurity Support," required the contractor to perform the same functions: serve as ISSM, "[p]repare A&A packages for Government review and validation," and "[i]dentify and analyze threats and vulnerabilities to

21

information systems," with Task 5 separately requiring ACAS reporting and STIG remediation. Ex. M at 14, 17-18.

77.     Second, the AoI's Software Engineering and Development capability requires the contractor to "provide full lifecycle support for existing applications, focusing on sustainment, maintenance, and minor modernization," with expertise in "the Microsoft Visual Studio suite, C#, and SharePoint Designer," the ability to interface with "Microsoft SQL and Oracle databases," and a Senior Software Developer holding "IASAE Level II certification requirements with an active Secret clearance." Ex. G at 3-4.

78.     Similarly, Task 6 of the PWS, "Provide Programming Support," required programming using "all components of the Microsoft Visual Studio suite," "SharePoint Designer, C#," and database interfaces for the same AFCEC legacy systems, with the Senior Software Developer likewise required to hold "IASAE Level II Certification" with an active Secret clearance. Ex. M at 19, 27-28.  Task 5 separately required Oracle and SQL database administration.  *Id.* at 16.

79.     Third, the AoI's Functional and Business Systems Analysis capability requires the contractor to "bridge the gap between functional user needs and technical development teams, particularly for the EESOH-MIS system," using Agile to "[c]reate artifacts such as Use Cases, Epics, Features, and Stories using the Atlassian toolset (Jira, Zephyr, Confluence)," with the Senior Functional Task Lead requiring "[a] deep understanding of the EESOH-MIS system or a similar large-scale DoD enterprise system." Ex. G at 4.

80.     Similarly, Task 8 of the PWS, "Provide Functional Support," required the contractor to provide functional requirements analysis for the EESOH-MIS using Agile methodologies, document requirements using the same Atlassian toolset, and create Epics,

Features, and Stories, with the Senior Functional Task Lead required to have "[a] minimum of five years of experience using and/or supporting EESOH-MIS." Ex. M at 21, 28.

81.    Fourth, the AoI's SharePoint Database Systems Re-engineering capability requires the contractor to "re-engineer three separate AFCEC/CXA SharePoint databases (Inventory Management, Chemical Database, and Operations Work Order) into a single, consolidated web application hosted in a cloud environment like TaMIS," managing the full project lifecycle through "agile development, data migration, testing, RMF Security Assessment and release to production," and ensuring compliance with all RMF cybersecurity requirements for NIPRNet access. Ex. G at 4-5.

82.    Similarly, Task 6 of the PWS required development using "Microsoft Visual Studio suite, SharePoint Designer, C#" and database interfaces for the existing AFCEC systems, all hosted "within the TaMIS AWS GovCloud IL4 and IL2 Enclaves." Ex. M at 5, 19.

83.    Beyond the four capability areas above, the AoI introduces AI-enabled analytics and a Fire Certification platform. *See* Ex. G at 5. These elements, however, are not "prototypes," but represent natural extensions of BEAT's existing work.

84.    The AI analytics requirement adds analytic capabilities to operational systems BEAT already manages and maintains. Indeed, the AoI itself states that this capability aims to "*enhance* AFCEC business processes and mission outcomes." *Id.* at 4.

85.    The Fire Certification Platform likewise is a discrete software development task using the same technology, security, and risk management framework existing under the Incumbent Contract. *See* Ex. M at 19.

86.    Neither element constitutes a "prototype project" within the meaning of 10 U.S.C. § 4022(e)(5). Rather, these new elements are incremental additions to an existing program.

23

87.    Finally, the awardee's own conduct confirms the status of the new contract as a mere follow-on requirement to BEAT's Incumbent Contract.  Specifically, within hours of receiving the award, Inserso's Executive Vice President emailed BEAT's incumbent employees, informing them that the contract "will be replacing the existing AFCEC IT support contract" and recruiting them to "continue to support" AFCEC in the same roles they have been performing under BEAT's Incumbent Contract.  *See* Ex. J.

88.    For these reasons, the Air Force's award of Agreement No. FA8903269B008 as a prototype OTA under 10 U.S.C. § 4022 is contrary to law.

89.    The award should be set aside on this basis, as well.

## PRAYER FOR RELIEF

WHEREFORE, BEAT respectfully requests that the Court:

1.    Declare that the awardee benefitted from an unfair competitive advantage and therefore should be disqualified from the procurement;

2.    Declare that the Air Force's reliance on OTA in making award is contrary to law;

3.    Enjoin performance of the awarded contract;

4.    Order the Air Force to re-assess its procurement strategy in light of these findings; and

5.    Grant BEAT such other and further relief as the Court may deem just and proper.

Dated: July 20, 2026                                      Respectfully submitted,


                                                         **FRIED, FRANK, HARRIS, SHRIVER
                                                         & JACOBSON LLP**

*Of Counsel*:

                                                          */s/ Alexander B. Ginsberg*
Robert C. Starling                                       Alexander B. Ginsberg
Fried, Frank, Harris, Shriver                            801 17th Street, NW
   & Jacobson LLP                                        Washington, D.C. 20006
801 17th Street, NW                                      Tel: (202) 639-7000
Washington, D.C. 20006                                   Fax: (202) 639-7003
Tel: (202) 639-7000                                      Email: alexander.ginsberg@friedfrank.com

                                                         *Counsel for Business Enabled Acquisition
                                                         and Technology, Inc.*


Enclosures A-M

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the foregoing was filed electronically via the

CM/ECF system.  A true and correct copy was also served by email to the following party, this

20th day of July 2026:

U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, DC 20530
nationalcourts.bidprotest@usdoj.gov

*/s/ Alexander B. Ginsberg*
Alexander B. Ginsberg